### In re LORAZEPAM & CLORAZEPATE ANTITRUST LITIGATION.

**This Opinion applies to: Advocate Health Care, et al., on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Mylan Laboratories, Inc. et al., Defendants.**

**No. MDL 1290(TFH) MISC. 99MS276(TFH), CIV. 99–0790(TFH).**

United States District Court, District of Columbia.

July 2, 2001.

**14**

Arthur M. Kaplan, Fine, Kaplan and Black, R.P.C., Philadelphia, PA, Michael D. Hausfeld, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, for Plaintiffs.

James B. Weidner, Clifford Chance Rogers & Wells, New York City, for Defendant Mylan Laboratories, Inc., et al.

1. The background set forth below is specifically taken from the public version of the plaintiffs'

### MEMORANDUM OPINION

HOGAN, Chief Judge.

Pending before the Court are the plaintiffs' motion for class certification and the defendants' motion to dismiss in this MDL antitrust action. The putative direct purchaser plaintiffs claim that as a result of the defendants' anticompetitive behavior—specifically, the defendants' conspiracy to monopolize, monopolization, and price fixing concerning certain generic anti-anxiety drugs—they paid enormously higher prices than they would have paid in a competitive market. En route to their ultimate goal of treble-damages under the Clayton Act for the overcharges they paid as a result of the alleged antitrust violations, the plaintiffs now seek class certification. The defendants, however, argue that the plaintiffs lack standing in this case to assert their claims. Upon careful consideration of the parties' motions, the oppositions, replies, and sur-replies thereto, a hearing held in open court on June 14, 2001, and the entire record herein, the Court will deny the defendants' motion to dismiss and grant the plaintiffs' motion for class certification.

### I. BACKGROUND

For purposes of the instant motions for class certification and to dismiss, the Court will accept as true the allegations of the plaintiffs' complaint. *See, e.g., Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir.1978); *FTC v. Mylan Labs., Inc.*, 62 F.Supp.2d 25, 33 (D.D.C.1999). The facts below are presented accordingly and do not constitute factual findings.[1]

The four named plaintiffs—Advocate Health Care ("Advocate"); St. Charles Hospital and Rehabilitation Center ("St. Charles"); Dik Drug Company ("Dik Drug"); and Harvard Pilgrim Health Care, Inc. ("Harvard Pilgrim")—have brought this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and a purported class of direct purchasers of generic anti-anxiety drugs known as lorazepam and clorazepate during the pe-

Consolidated Amended Class Action Complaint filed on December 23, 1999 ("Compl.").

riod January 12, 1998 through the present. *See* Compl. ¶ 11. They claim that the defendants conspired to monopolize, monopolized, and fixed prices of lorazepam and clorazepate, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[2] Advocate is an Illinois not-for-profit corporation that is the largest fully integrated health care delivery system in metropolitan Chicago. Through a subsidiary it operates eight hospitals, and with more than 4,000 affiliated physicians it has Chicago's largest physician network. *See id.* ¶ 7. St. Charles is a New York not-for-profit organization that offers a broad range of medical, surgical, and rehabilitation services at its community teaching and regional rehabilitation hospital. *See id.* ¶ 8. Dik Drug is a regional wholesale distributor, organized under Illinois law, of over 28,000 drugs to over 900 independent retail pharmacies, hospitals, and nursing home providers. *See id.* ¶ 9. Finally, Harvard Pilgrim is a Massachusetts not-for-profit managed healthcare company providing health benefit plans to approximately 1.35 million members throughout New Hampshire, Rhode Island, and Massachusetts. It is a licensed health maintenance organization ("HMO") in Massachusetts and Maine. It also has affiliated HMOs in New Hampshire, Rhode Island, and Massachusetts. Its products include point-of-service plans, preferred provider organizations, traditional health maintenance organization, and Medicare and Medicaid plans. *See id.* ¶ 10. The plaintiffs allege that during the relevant class period they each "purchased generic lorazepam and clorazepate tablets directly from Mylan at prices set by Mylan pursuant to contract." *Id.* ¶¶ 7–10.

The defendants—Mylan Laboratories, Inc. ("Mylan Laboratories"), Mylan Pharmaceuticals, Inc. ("Mylan Pharmaceuticals"), UDL Laboratories, Inc. ("UDL"), Cambrex Corporation ("Cambrex"), Profarmaco S.R.L. ("Profarmaco"), Gyma Laboratories of America, Inc. ("Gyma"), and SST Corporation ("SST")—are all involved in the supply side of the generic drug industry. Mylan Laboratories is a Pennsylvania corporation engaged in developing, licensing, manufacturing, marketing, and distributing generic and proprietary pharmaceutical and wound care products, including at least 91 generic drugs. Mylan Pharmaceuticals, a wholly owned subsidiary of Mylan Laboratories, is one of the world's largest generic drug companies. UDL, another wholly owned subsidiary of Mylan Laboratories, maintains manufacturing and research and development facilities in Illinois. *See id.* ¶ 18. Cambrex manufactures and sells chemicals for pharmaceuticals, cosmetics, agriculture, and other industrial uses. *See id.* ¶ 20. Profarmaco, located in Italy, is a wholly owned subsidiary of Cambrex that manufactures chemicals including APIs, which is the most essential raw material for a pharmaceutical product, and sells them to manufacturers of drugs in the United States and elsewhere. *See id.* ¶ 21. Gyma is a New York corporation in the business of selling APIs and other chemicals to the pharmaceutical industry. It buys APIs from Profarmaco and other firms and resells them to generic drug manufacturers in the United States. *See id.* ¶ 22. Finally, SST is a New Jersey corporation that is also engaged in the business of selling APIs and other chemicals to the pharmaceutical industry. It buys APIs from Fabricca Italiana Sintetici SpA ("FIS") and other firms and resells them to generic drug manufacturers in the United States. *See id.* ¶ 23.

Generic drugs, which are chemically identical versions of branded drugs, cannot be marketed until after the patent on the branded drugs has expired. Firms that manufacture and market generic drugs often specialize in such drugs, although Mylan manufactures both generic and branded drugs. Generic drugs are sold at substantial discounts from the price of branded drugs. *See* Compl. ¶ 25.

Mylan and other generic drug manufacturers require the approval of the Food and

---

2. The Complaint specifically alleges restraint of trade on clorazepate and lorazepam, conspiracy to monopolize the generic lorazepam and clorazepate tablets markets, monopolization of the generic lorazepam and clorazepate tablets mar- kets, attempted monopolization of the generic lorazepam and clorazepate tablets markets, and price fixing agreement on lorazepam API. *See* Compl. ¶¶ 63–96.

Drug Administration ("FDA") to market a generic product in the United States. For each generic drug, the manufacturer must file an Abbreviated New Drug Application ("ANDA") with the FDA to establish that its version of the drug is therapeutically equivalent to the branded drug. FDA approval of an ANDA takes an average of about 18 months. *See id.* ¶ 26.

The generic manufacturer typically purchases the Active Pharmaceutical Ingredient ("API") from a specialty chemical manufacturer such as SST or Gyma. The generic manufacturer combines the API with inactive filters, binders, colorings and other chemicals to produce a finished product. To sell an API in the United States, the API supplier must file a Drug Master File ("DMF") with the FDA. The DMF explains the processes that the API supplier uses to make the API and to test chemical equivalence and bioequivalence to the brand product. To use an API, the generic manufacturer's ANDA must refer to the API supplier's DMF filed with the FDA. More than one drug manufacturer can reference the DMF of the same API supplier. A generic manufacturer that wants or needs to change its API supplier must obtain FDA approval of an ANDA supplement which includes a reference to the new supplier's DMF and test results regarding the generic manufacturer's product using the new API. This process averages about eighteen months, although it can take as long as three years. *See id.* ¶¶ 27–28.

Lorazepam and clorazepate are two of the approximately 91 generic drugs that Mylan currently manufactures and sells in tablet form. Lorazepam is used to treat anxiety, tension, agitation, insomnia, and as a preoperative sedative. Doctors issue over 18 million prescriptions a year for lorazepam tablets. Because lorazepam is used to treat chronic conditions and is heavily prescribed for nursing home and hospice patients, lorazepam users tend to stay on the drug for long periods of time. Clorazepate is used to treat anxiety and in adjunct therapy for nicotine and opiate withdrawal. Doctors issue over three million prescriptions a year for clorazepate tablets. *See id.* ¶ 30.

Profarmaco and FIS manufacture APIs in Italy. Profarmaco holds DMF's for lorazepam API and clorazepate API, and has supplied such APIs to drug manufacturers in the United States. Such foreign firms typically have distributors in the United States who purchase APIs and resell them to U.S. generic drug manufacturers. Gyma is Profarmaco's U.S. distributor of lorazepam and clorazepate; SST is FIS's U.S. distributor for lorazepam. Mylan purchases its lorazepam and clorazepate API from Gyma. Mylan has not purchased FIS's lorazepam from SST, however, because FIS is not an approved lorazepam supplier for Mylan (that is, Mylan's ANDA does not reference FIS's DMF). Other drug manufacturers have purchased FIS's API from SST. *See id.* ¶¶ 31–33.

The plaintiffs allege the following anticompetitive conduct on the part of the defendants. In 1997, Mylan set out to raise the price, and therefore profitability, of some of its generic drugs by seeking from its API suppliers long-term exclusive licenses for the DMFs of certain APIs selected because of the limited degree of generic competition. If Mylan obtained such an exclusive license, no other generic drug manufacturer could use that supplier's API to make the drug in the United States. Mylan sought exclusive licenses for the DMFs for lorazepam API and clorazepate API. *See id.* ¶¶ 44–45.

Mylan entered into contracts with Profarmaco and Gyma under which these firms would license exclusively to Mylan for ten years. The exclusive licenses would provide Mylan with complete control over Profarmaco's entire supply of lorazepam API and clorazepate API entering the United States. With complete control of Profarmaco's supply of these products and by refusing to sell to any of its competitors, Mylan would deny its competition access to the most important ingredient for producing lorazepam and clorazepate tablets. In return for the ten-year exclusive licenses, Mylan offered to pay Cambrex, Profarmaco, and Gyma a percentage of gross profits on sales of lorazepam and clorazepate tablets, regardless from whom Mylan purchased the API. *See id.* ¶¶ 46–54.

Mylan also tried to execute an exclusive licensing arrangement with SST for control

of its lorazepam supply from FIS. This is significant because Mylan was not authorized by the FDA to sell lorazepam manufactured with SST API (that is, Mylan's ANDA did not reference SST's DMF). Although SST would not license FIS's DMF for lorzepam API to Mylan, SST nonetheless agreed to be the best partner Mylan ever had respecting lorazepam, meaning that SST would also raise their prices of API for lorazepam. *See id.* ¶¶ 50, 55–56.

On or around January 12, 1998, despite no significant increase in its costs, Mylan raised its price of clorazepate tablets to plaintiffs and the class by amounts ranging from 1,900 percent to over 3,900 percent, depending on bottle size and strength. On March 3, 1998, again despite no significant increase in its costs, Mylan raised its price of lorazepam tablets by amounts ranging from 1,900 to over 6,500 percent. Shortly thereafter, SST raised the price of lorazepam API by approximately 19,000 percent. SST sold the lorazepam API to Geneva Pharmaceuticals, Inc., one of Mylan's competitors, which also raised its prices to approximately the price of Mylan's tablets. Ultimately, therefore, the plaintiffs and the class were deprived of free unfettered competition in the purchase and sale of generic lorazepam and clorazepate and paid substantially higher prices for generic lorazepam and clorazepate tablets than they would have otherwise paid. *See id.* ¶¶ 57–60.

## II.  DISCUSSION

### A.  Defendants' Motion to Dismiss

The defendants have moved to dismiss this lawsuit under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), claiming that the putative direct purchaser plaintiffs lack standing in the unique context of this case in which the FTC has successfully petitioned for disgorgement under section 13(b) of the Federal Trade Commission Act, 15 U.S.C.

§ 53(b) (2000), and in which direct purchasers contemporaneously seek treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15 (2000).

■ In general, only direct purchasers have standing to assert antitrust injury in a private, treble damages action under section 4 of the Clayton Act. *See Hanover Shoe, Inc. v. United Shoe Mach., Corp.,* 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 728–29, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In *Hanover Shoe,* a shoe manufacturer brought a private antitrust action for treble damages under section 4 of the Clayton Act against a manufacturer of shoe machinery. 392 U.S. at 483, 88 S.Ct. 2224.[3] The defendant attempted to show that the plaintiff had not been injured in its business because it had passed on the claimed illegal overcharge to its own customers. The Supreme Court rejected the defense, however, holding that with few exceptions a direct purchaser is injured, within the meaning of section 4, by the full amount of the overcharge paid by it and that the antitrust defendant is not allowed to introduce pass-on evidence that indirect purchasers were in fact injured by the overcharge. *See id.* at 494, 88 S.Ct. 2224. The Court primarily rested its holding on an unwillingness to complicate section 4 actions with speculative attempts to trace of the effects of the overcharge down a distribution channel and a concern that indirect purchasers would have an inadequate incentive to enforce the antitrust laws because they would often have too little stake in the lawsuit. *See id.* at 492–93, 88 S.Ct. 2224.

■ In *Illinois Brick,* the Supreme Court addressed the other side of the same coin—that is, whether an indirect purchaser may offensively use a pass-on theory to show antitrust injury in a section 4 action, despite the fact that a pass-on theory may not be used defensively. 431 U.S. at 726, 728, 97 S.Ct.

---

**3.** Section 4 of the Clayton Act provides in pertinent part:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15.

2061. In that case, the plaintiffs were indirect purchasers of concrete block, which passed through two levels in the chain of distribution before reaching them. *See id.* at 726–27, 97 S.Ct. 2061.[4] The State of Illinois sued under section 4, arguing that *Hanover Shoe* should be limited to its factual context and that indirect purchasers should be able to use a pass-on theory of antitrust injury. The Supreme Court rejected this argument, holding that only direct purchasers have standing to assert antitrust injury for the purposes of section 4 of the Clayton Act. *See id.* at 728–29, 97 S.Ct. 2061. The Court reached this result in two steps. First, it "conclude[d] that whatever rule is to be adopted regarding pass-on in antitrust damages actions, it must apply equally to plaintiffs and defendants." *Id.* at 728, 97 S.Ct. 2061. Second, it "decline[d] to abandon the construction given § 4 in *Hanover Shoe* that the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of the section." *Id.* at 729, 97 S.Ct. 2061.

While articulating the general rule of these cases that only direct purchasers may assert standing for antitrust injury in section 4 cases, the Supreme Court has noted a possible exception:

> We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present.

*Hanover Shoe*, 392 U.S. at 494, 88 S.Ct. 2224. In such situations, the buyer is insulated from any decrease in sales when attempting to pass on the overcharge because its customer must purchase a fixed quantity regardless of price. In other words, the effect of the overcharge is preordained, rather than determined by the complicated forces of supply and demand. *See Illinois Brick*, 431 U.S. at 736, 97 S.Ct. 2061. The Court has

indicated, however, "the narrow scope it intended for any exception to its rule barring pass-on defenses." *Id.* at 735–36, 97 S.Ct. 2061. And it appears that, in addition to a case involving a cost-plus contract, the only other explicitly recognized "situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer." *Id.* at 736 n. 16, 97 S.Ct. 2061. Thus, it appears quite clear that the Supreme Court does not intend for exceptions to the direct purchaser rule to be lightly inferred. As the Supreme Court stated in *Kansas v. UtiliCorp*:

> The rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases. We nonetheless believe that ample justification exists for our stated decision not to "carve out exceptions to the [direct purchaser] rule for particular types of markets." ... The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule. As we have stated: "[T]he process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum would entail the very problems that the *Hanover Shoe* rule was meant to avoid. The litigation over where the line should be drawn in a particular class of cases would inject the same 'massive evidence and complicated theories' into treble-damages proceedings, albeit at a somewhat higher level of generality." ... In sum, even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions. Having stated the rule in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation of § 4.

497 U.S. 199, 216–17, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990).

---

4. The defendants manufactured and distributed concrete block to masonry contractors, who in turn submitted bids to general contractors for the masonry portion of construction projects. The general contractors would then submit bids for these projects to their customers such as the plaintiff State of Illinois. *See Illinois Brick*, 431 U.S. at 726–27, 97 S.Ct. 2061.

The defendants claim that the unusual circumstances of this case present an issue of first impression: whether the *Illinois Brick* direct purchaser rule applies in the context of the FTC's having won a monetary recovery for the benefit of consumers pursuant to the remedial provisions of section 13(b) of the FTC Act for alleged antitrust violations, while at the same time purported direct purchaser plaintiffs are seeking treble damages under section 4 of the Clayton Act for the same alleged violations. The defendants argue that it does not, and therefore, the plaintiffs lack standing.

The defendants begin with a premise that the Supreme Court articulated the *Illinois Brick* principle only as a matter of prudence, or policy, not because the statutory language required it or even because Congress intended it. *See* Defs' Mem. at 5. From there they propose and ask this Court to adopt a so-called "Ultimate Purchase Rule":

> The approach that will best promote congressional objectives with respect to both § 13(b) of the FTC Act and § 4 of the Clayton Act, is one that recognizes the relative primacy of the FTC when it has commenced an action under § 13(b), while giving full effect to the remedial provision of § 4. This can be accomplished by a rule which acknowledges that the purchasers for whose benefit the FTC seeks a monetary recovery effectively have already been deemed to be the "injured parties" by the FTC's filing a § 13(b) action and should also be regarded as such for purposes of seeking potential treble damages under § 4. And, because the Supreme Court has consistently ruled that only one purchaser in a chain of distribution should be entitled to assert antitrust injury based on an overcharge, the ability to seek such damages should be limited to the purchasers thus identified.

Defs' Mem. at 7–8. The defendants then argue why this rule would "much better serve[ ]" the policies underlying *Illinois Brick*. Defs' Reply at 1. First, they claim, without the rule duplicative recovery will result in this case because the FTC has sought, and through the settlement will recover, the same alleged overcharge underlying the private action. Such duplicative recovery, contend the defendants, is unacceptable. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 474, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (noting that the *Illinois Brick* Court "found unacceptable the risk of duplicative recovery engendered by allowing both direct and indirect purchasers to claim damages resulting from a single overcharge by the antitrust defendant") (citing *Illinois Brick*, 431 U.S. at 730–31, 97 S.Ct. 2061). Second, the defendants argue that their proposed ultimate purchaser rule simplifies the identification of the proper injured party, thereby increasing the effectiveness of antitrust enforcement, because the injured parties have already been identified when the FTC has chosen to use the remedial provisions of section 13(b). Finally, the defendants assert that the ultimate purchaser rule would adequately address incentives to enforce the antitrust laws. That is, by definition the rule would apply only when the FTC has brought an action; thus, there is no concern about enforcement, and in any event, standing to sue for treble damages would still be available to the appropriate indirect purchasers. The defendants additionally claim that set-off is no solution to the dilemma presented in this case. According to the defendants, an offset can work when the same parties in two lawsuits make claims on the same fund, but apportionment cannot be used for different classes of plaintiffs each seeking total recovery. *Cf., e.g., Illinois Brick*, 431 U.S. at 731 n. 11, 97 S.Ct. 2061 (rejecting procedural devices such as the Multidistrict Litigation Act, 28 U.S.C. § 1407, and statutory interpleader, 28 U.S.C. § 1335, to bring indirect and direct purchasers together in one action in order to apportion damages among them, because "[t]hese procedural devices cannot protect against multiple liability where the direct purchasers have already recovered by obtaining a judgment or by settling, as is more likely").

The defendants' arguments, while creative, are not persuasive. As the Supreme Court has made clear, any exception to the *Illinois Brick* direct purchaser rule must be narrowly restricted to a situation in which complex market forces are stripped of their effect due to preexisting conditions, such as with a cost-

plus contract, so that the pass-on is clearly discernable. *See UtiliCorp,* 497 U.S. at 216–17, 110 S.Ct. 2807; *Illinois Brick,* 431 U.S. at 735–36 & n. 16, 97 S.Ct. 2061; *Hanover Shoe,* 392 U.S. at 494, 88 S.Ct. 2224. The defendants here have made no showing that this case fits that exception. To the contrary, they spend considerable effort attempting to show how their proposed alternative, the Indirect Purchaser Rule, better comports with the policy rationale behind *Illinois Brick's* holding. But *Illinois Brick* is not a policy holding; the Supreme Court itself has explicitly stated that *Illinois Brick* was a case of statutory construction. *See, e.g., Illinois Brick,* 431 U.S. at 736–37, 97 S.Ct. 2061 ("In considering whether to cut back or abandon the *Hanover Shoe,* rule, we must bear in mind that considerations of stare decisis weigh heavily in the area of *statutory construction,* where Congress is free to change this Court's interpretation of its legislation. This presumption of adherence to our prior decisions *construing legislative enactments* would support our reaffirmance of the *Hanover Shoe construction* of § 4.") (emphasis added) (citation omitted); *ARC America,* 490 U.S. at 102–03, 109 S.Ct. 1661 ("As we made clear in *Illinois Brick,* the issue before the Court in both that case and in *Hanover Shoe* was *strictly a question of statutory interpretation—what was the proper construction of § 4 of the Clayton Act.*") (emphasis added). In thus providing a definitive construction to section 4 of the Clayton Act that gives direct purchasers standing to sue for treble damages, with very limited exceptions, it is clear that the Supreme Court did not intend for courts to examine on a case-by-case basis whether exclusive standing should be granted to indirect purchasers merely because the policies identified by the Court will better be promoted.

Moreover, while the defendants present an ostensibly colorable concern over potential multiple recovery in the unique circumstances of this case in which both equitable disgorgement under section 13(b) of the FTC Act and private treble damages under section 4 of the Clayton Act are sought, the Court finds that such risks, unlike the risk identified in *Illinois Brick* are insufficient to defeat standing for the putative direct purchasers in this case. Importantly, section 13(b) of the FTC Act and section 4 of the Clayton act are wholly separate causes of action. The FTC's ability to seek disgorgement in appropriate cases such as this under section 13(b) of the FTC Act, *see FTC v. Mylan Labs., Inc.,* 62 F.Supp.2d 25, 35–37 (D.D.C. 1999) (holding that the Commission could maintain an action for a permanent injunction and disgorgement under section 13(b)) (citing, *inter alia, Porter v. Warner Holding Co.,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332; *FTC v. Gem Merchandising,* 87 F.3d 466, 470 (11th Cir.1996)); *see also FTC v. Mylan Labs., Inc.,* 99 F.Supp.2d 1, 4 n. 2 (D.D.C.1999), is distinct from the ability of direct purchasers to maintain a private cause of action seeking trebled damages pursuant to section 4 of the Clayton Act. By contrast, *Illinois Brick's* multiple liability concern focused on the impermissible consequences of permitting one-sided, offensive use of a pass-on theory by different plaintiffs *both* seeking recovery under section 4:

> First, allowing offensive but not defensive use of pass-on would create a serious risk of multiple liability for defendants. *Even though an indirect purchaser had already recovered for all or part of an overcharge passed on to it, the direct purchaser would still recover automatically the full amount of the overcharge that the indirect purchaser had shown to be passed on; similarly, following an automatic recovery of the full overcharge by the direct purchaser, the indirect purchaser could sue to recover the same amount.* The risk of duplicative recoveries created by unequal application of the *Hanover Shoe* rule is much more substantial than in the more usual situation where the defendant is sued in two different lawsuits by plaintiffs asserting conflicting claims to the same fund.

431 U.S. at 730, 97 S.Ct. 2061 (emphasis added). Those concerns are not implicated in the same manner when the FTC brings an action pursuant to a wholly separate cause of action. In fact, a contrary holding would contravene the statutory language of section 11 of the FTC Act:

Nothing contained in this subchapter shall be construed to prevent or interfere with the enforcement of the provisions of the antitrust Acts or the Acts to regulate commerce, nor shall anything contained in this subchapter be construed to alter, modify, or repeal the said antitrust Acts or the Acts to regulate commerce or any part or parts thereof.

15 U.S.C. § 51. As the FTC points out, it is not unusual for Congress to provide different causes of action to different plaintiffs for the same unlawful acts. *See, e.g., California v. ARC America Corp.,* 490 U.S. 93, 105–06, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (holding that state indirect purchaser actions were not preempted by section 4 of the Clayton Act); *United States v. Borden Co.,* 347 U.S. 514, 518–19, 74 S.Ct. 703, 98 L.Ed. 903 (1954) (noting that "the private and public actions [for injunctive relief under sections 15 and 16 of the Clayton Act] were designed to be cumulative, not mutually exclusive") (citing S.Rep. No. 698, 63d Cong., 2d Sess. 42); *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1475 (2d Cir.1996) ("Since disgorgement is a method of forcing a defendant to give up the amount by which he was unjustly enriched, it is unlike an award of damages . . . and is neither foreclosed nor confined by an amount for which injured parties were willing to settle.") (citation omitted). If necessary, the Court can utilize apportionment to avoid duplicative recovery at a later stage in this lawsuit; unlike *Illinois Brick,* the risks identified by the defendants here are insufficient to defeat standing for the putative direct purchasers. Therefore, the Court will deny the defendants' motion to dismiss.

## B. Class Certification

Having rejected the defendants' arguments in support of their joint motion to dismiss, the Court must turn next to the plaintiffs' motion for class certification. The plaintiffs have moved to certify the following class of direct purchasers:

All persons and entities in the United States who purchased generic lorazepam tablets and/or generic clorazepate tablets directly from Defendants Mylan and UDL during the period January 12, ' 1998 through the present, excluding Defendants, their respective parents, subsidiaries and affiliates, any co-conspirators of Defendants, and all governmental entities.

Pls' Mem. at 1.

Federal Rule of Civil Procedure 23(c) provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Fed.R.Civ.P. 23(c)(1). In determining whether to certify a class, the Court does not consider the underlying merits of the plaintiff's claims, *see Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), and accepts as true the allegations set forth in the complaint. *See, e.g., Shelter Realty,* 574 F.2d at 661 n. 15. To obtain certification under Rule 23, the proposed class must comply with all four prerequisites of Rule 23(a) and one of the three subsections of Rule 23(b). The plaintiffs bear the burden of showing that these requirements have been satisfied. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The Court additionally notes in this particular context that long ago the Supreme Court recognized the importance that class actions play in the private enforcement of antitrust actions, stating that Rule 23 "enhance[s] the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture." *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 266, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Accordingly, courts have repeatedly found antitrust claims to be particularly well suited for class actions:

The treble-damages provision of the Clayton Act, 15 U.S.C. § 15, was designed to encourage private enforcement of the antitrust laws by offering generous recompense to those harmed by the proscribed conduct and simultaneously to erect a deterrent to those contemplating similar conduct in the future. *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). These linked objectives cannot be fully realized if large numbers of potential

claimants are not afforded an efficient and cost-effective method of vindicating their claims. The class action device is well-suited to afford the desired access.

*Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 38 (S.D.N.Y.1977); *accord In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 238 (E.D.N.Y.1998). *See also, e.g., Brown v. Pro Football Inc.*, 146 F.R.D. 1, 4 (D.D.C.1992) (stating that "the framers of Rule 23 seemed to target cases such as this [antitrust action] as appropriate for class determination"); *In re Plastic Cutlery Antitrust Litig.*, No. 96–CV–728, 1998 WL 135703, at *2 (E.D.Pa. Mar.20, 1998) ("Class actions are widely-recognized as being particularly appropriate for the litigation of antitrust cases alleging a price-fixing conspiracy because price-fixing schemes presumably impact all purchasers in the affected market, so that common questions on the issue of liability predominate."). And because of this important role for class actions in the private enforcement of antitrust claims, "courts resolve doubts in favor of certifying the class." *Playmobil*, 35 F.Supp.2d at 239 (citing *In re Control Data Corp. Sec. Litig.*, 116 F.R.D. 216, 219 (D.Minn.1986)); *accord Plastic Cutlery*, 1998 WL 135703, at *2; *In re Infant Formula Antitrust Litig.*, MDL No. 878, 1992 WL 503465, at *6 (N.D.Fla. Jan.13, 1992).[5]

### 1. Standing

■ Before reaching the Rule 23 requirements, however, the Court must address a second standing argument advanced by the defendants. *See In re NASDAQ Market–Makers Antitrust Litigation*, 169 F.R.D. 493, 504–05 (S.D.N.Y.1996) ("Standing to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made."). The defendants contend that the plaintiffs have neither adequately defined the term "direct purchaser" nor sufficiently explained how they and other putative class members "directly" purchased the drugs from Mylan, and they offer three arguments for support. Defs' Opp. at 16, 17–30. First, they argue that direct purchasers are unascertainable in the markets at issue here with the definition of the class given by the plaintiffs:

> Product in the generic industry today is sold through a web of interconnected relationships among numerous entities at different levels of the distribution chain.... These relationships are vertical, sideways, diagonal. And the terms of the transactions vary considerably—from ad hoc contracts between manufacturers and drug wholesalers, to multi-layered written and oral contracts among manufacturers, wholesalers, individual retailers, managed care organizations, and GPOs (group purchasing organizations that combine the power of varying purchasers).... Mere reference to industry structure thus cannot establish antitrust standing as among the participants.

Defs' Opp. at 19. Second, the defendants point out that the four proposed class representatives—Advocate, St. Charles, Harvard Pilgrim, and Dik Drug—occupy different levels on the distribution chain, have dissimilar purchasing procedures, and different degrees of contact with Mylan. *See* Defs' Opp. at 21–25. And the defendants complain that the plaintiffs have sought to certify a class that would include two or more entities staking a claim on the same transaction (for example, a GPO and a wholesaler), when only one such entity may have standing to recover the alleged overcharge under *Illinois Brick*. Finally, the defendants argue that the data upon which the plaintiffs base their estimates of direct purchasers—that is, "invoice" and "chargeback" data—has not been adequately explicated, demonstrates inherent inconsistency about direct purchasers vis-à-vis indirect purchasers, and lacks crucial information. *See* Defs' Opp. at 27–30; Defs' Reply

---

**5.** *Cf. Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir.1968) ("[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.") (citing *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 566 (2d Cir. 1968)); *accord Green v. Wolf Corp.*, 406 F.2d 291, 298, 301 (2d Cir.1968); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 88 (S.D.N.Y.1998); *Playmobil*, 35 F.Supp.2d at 239.

at 19.[6]

The Court disagrees and concludes that the plaintiffs have made a sufficient showing of standing. The plaintiffs' economics expert, after reviewing invoice and accounting data provided by Mylan for 1996 through December 1999, states that he found at least 97 "invoice" customers and over 11,600 "contract" customers that purchased lorazepam and clorazepate from Mylan. Pls' Mem., Ex. 1 ¶ 28 & n. 31 (Frank Aff.).[7] The Court agrees with the plaintiffs' argument, therefore, that invoice purchasers such as Dik Drug are members of the direct purchaser class "to the extent that they purchased directly from Mylan for their own account"; such customers were invoiced directly by Mylan for clorazepate and lorazepam and paid those invoices directly to Mylan. Pls' Reply at 19. The Court also agrees with the plaintiffs' similar claim that " 'contract' customers by their nature are persons who purchased clorazepate or lorazepam pursuant to their contract with Mylan," and therefore are members of the class "to the extent that they purchased clorazepate or lorazepam directly from Mylan." *Id.* The Court does not disagree with the defendants' point that discerning direct purchasers vis-à-vis indirect purchasers in the pharmaceuticals industry is complex. But the defendants' particular quest here implicitly treads dangerously close to making the senseless point that no one may be sued for antitrust injury in the pharmaceuticals industry because it is too difficult to weed out the indirect purchasers.[8] To the contrary, as the plaintiffs point out, direct purchases from Mylan were among the numerous and varied purchasing arrangements they had during the relevant period.

The plaintiffs have cited a litany of post-*Illinois Brick* decisions certifying (and therefore implicitly finding standing for similar direct purchaser classes that, when juxtaposed to the dearth of authority cited by the defendants rejecting a direct purchaser class definition as amorphous or indefinite, lend direct support to the adequacy of the plaintiffs' showing here). *See, e.g., In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 236, 249 (E.D.N.Y.1998) (certifying class of "[a]ll persons ... [who purchased] ... Playmobil products directly from Defendant or Co–Conspirator Retailers"); *In re Commercial Tissue Prods.*, 183 F.R.D. 589, 590 (N.D.Fla. 1998) (certifying class of "all Persons ... who purchased Commercial Tissue Products directly from defendants, or their respective parents subsidiaries or affiliates"); *In re Plastic Cutlery Antitrust Litig.*, No. 96–CV–728, 1998 WL 135703, at *9 (E.D.Pa. Mar.20, 1998) (certifying class of "[a]ll purchasers in the United States of plastic cutlery directly from the defendants or their respective wholly-owned subsidiaries or affiliates"); *Lumco Indus., Inc. v. Jeld–Wen, Inc.*, 171 F.R.D. 168, 171 (E.D.Pa.1997) (certifying class of "[a]ll persons, firms, corporations, partnerships, groups, or other entities in the United States and its territories ... that purchased residential flush doors in the United States directly from any of" the defendants); *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 527 (M.D.Fla.1996) (certifying class of "[a]ll purchasers of Vistakon, B & L and CIBA replacement contact lenses from eye care practitioners"); *In re Citric Acid Antitrust Litig.*, 1996 WL 655791, at *1 (N.D.Cal. Oct.2, 1996) (certifying class of

---

**6.** For example, the defendants state that in each transaction for which an entity (e.g., a GPO member like St. Charles) would claim a "contract" with Mylan, a different entity usually would be "invoiced" by Mylan (e.g., a wholesaler like Dik Drugs). But the data lacks crucial information for making a proper standing choice between these entities, such as the sequence of the transaction's negotiations, shipment, payment, etc. *See* Defs' Reply at 19.

**7.** Exhibit 1 to the plaintiffs' joint motion for class certification is the affidavit of Professor Richard G. Frank, the Margaret T. Morris Professor of Health Economics at Harvard University Medical School. [Redacted].

**8.** In fairness, the defendants have taken measured steps to distinguish their argument from the latter absurdity by arguing that the plaintiffs' definition and proposed representatives, in particular, fail in light of the data at hand. However, further evidence to the Court that the defendants' arguments are implicitly tantamount to the same thing is defense counsel's inability, in response to the Court's questioning at the hearing, to either hypothesize a direct purchaser that would have standing in this case or concede that at least one of the named plaintiffs has standing.

"[a]ll persons and entities in the United States . . . who purchased citric acid directly from any of the defendants"); *In re Aluminum Phosphide Antitrust Litig.,* 160 F.R.D. 609, 612 (D.Kan.1995) (certifying class of "all similarly situated persons, firms, corporations or other entities of any nature in the United States . . . who purchased aluminum phosphide products directly from one or more of the defendants"); *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 688 (D.Minn. 1995) (certifying class of "all purchasers in the United States of potash [a mineral typically mined from land deposits, which is widely used as one of the three basic raw materials (along with phosphorous and nitrogen) for fertilizer production in turn used for agricultural purposes] directly from defendants or any subsidiary or affiliate thereof"); *In re Carbon Dioxide Antitrust Litig.,* 149 F.R.D. 229, 232 (M.D.Fla.1993) (certifying class of "all individuals and entities . . . in the continental United States that purchased carbon dioxide directly from any Defendant"); *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1032 (N.D.Miss.1993) (certifying class of "[a]ll purchasers of processed catfish and catfish products in the United States who . . . directly purchased processed catfish and catfish products from one or more of the defendants"); *In re Infant Formula Antitrust Litig.,* MDL No. 878, 1992 WL 503465, at *6 (N.D.Fla. Jan.13, 1992) (certifying class of "all persons, firms, corporations, or other entities in the United States . . . that purchased milk-based and soy-based infant formula from any defendant, or any parent, subsidiary or affiliate of any defendant"); *In re Wirebound Boxes Antitrust Litig.,* 128 F.R.D. 268, 269 (D.Minn.1989) (certifying class of "[a]ll persons . . . who . . . were customers of defendants for wirebound boxes in the United States"); *In re Chlorine and Caustic Soda Antitrust Litig.,* 116 F.R.D. 622, 623 (E.D.Pa.1987) (certifying class of "[a]ll purchasers in the United States of chlorine or caustic soda directly from defendants or defendants' subsidiaries or affiliates"). *See also, e.g., NASDAQ,* 169 F.R.D. at 503–04 (certifying "a Class consisting of all persons, firms, corporations, and other entities . . . who purchased or sold Class Securities on the Nasdaq National Market, trading directly (or through agents) with the Defendants or their co-conspirators, or with their respective affiliates"). The Court notes a couple cases in particular. The first is this Court's conditional certification of a similar class definition concerning direct purchasers of vitamin products for the purposes of settlement, defined as follows:

(a) All persons . . . that directly purchased one or more Vitamin Products . . . from any [defendant or affiliate].

(b) All persons . . . that directly purchased Choline Choloride . . . from any [defendant or affiliate].

11/23/99 Order Conditionally Certifying Settlement Classes And Preliminarily Approving Proposed Settlement, *In re Vitamin Antitrust Litig.,* MDL No. 1285, Misc. No. 99–0197(TFH), at 2. The second is a recent case from the Eastern District of Michigan, in which direct purchasers—including drug wholesalers, chain pharmacies, independent pharmacies, food and drug stores, hospitals, clinics, long term care facilities, mail order pharmacies, and governmental agencies—of Cardizem CD alleged that the defendants fixed, inflated, maintained, and stabilized the prices direct purchasers paid for the drug by delaying generic competition. *In re Cardizem CD Antitrust Litigation,* 200 F.R.D. 297, 300 & n. 1 (E.D.Mich.2001). The court certified the following class:

All persons, or assignees of such persons, who have *directly purchased* Cardizem CD from HMRI at any time during the period July 9, 1998 through and after the date hereof until the effects of Defendants' illegal contract, combination or conspiracy cease and who also either (1) purchased generic versions of Cardizem CD; or (2) obtained increased discounts for their direct purchases of Cardizem CD after the generic versions belatedly entered the market. Excluded from the Class are Defendants and their officers, directors, management and employees, subsidiaries or affiliates.

*Id.* at 301 (emphasis added).

The defendants attempt to distinguish such cases arguing that *Cardizem,* for example, certified both a regional wholesaler (first-tier) and a regional pharmacy chain (second-

tier purchaser) as class representatives only because the regional pharmacy chain had purchased the drug through another regional wholesaler and had been assigned the Cardizem-related claims by that wholesaler through private contract. *See Cardizem,* 200 F.R.D. at 305–07 (rejecting defendants' arguments that the pharmacy chain was both a direct and indirect purchaser, thereby creating an inherent conflict of interest and danger of double recovery, because the chain's antitrust claim was "brought solely as an assignee"). The defendants similarly assert that in *NASDAQ,* 169 F.R.D. at 503–06, the court certified parties who traded through brokers only because the Court found statutorily provided agency between them. *See NASDAQ,* 169 F.R.D. at 505–06.

The Court, however, finds the instant case to be sufficiently analogous to such cases. The plaintiffs and their counsel here have averred, represented, and evidenced that they either purchased the drugs themselves from Mylan or, like the plaintiffs in *NAS-DAQ,* they purchased through agents. In *NASDAQ,* buyers and sellers of securities brought a price-fixing action against NAS-DAQ market makers. 169 F.R.D. at 501–02.[9] The plaintiffs claimed that the market makers fixed the market spread, which was the primary source of their profit. The defendants countered that the plaintiffs lacked standing under *Illinois Brick* because the proposed class members were indirect purchasers who traded through brokers not owned or controlled by the defendants. The court rejected the defendants' arguments and certified the class. *See id.* at 505–06 (defining class "to include investors who transacted through non-Defendant owned brokers where those brokers did not function as a distinct economic entity in the chain of purchase or sale"); *see also In re NASDAQ Market–Makers Antitrust Litigation,* 172 F.R.D. 119, 124–25 (S.D.N.Y.1997) (adding institutional investors to the certified class of individual investors despite defendants' argu-

ments that the factors that affect price and size negotiations between were too varied and complex to permit a determination of the alleged conspiracy's impact on trades between institutional investors and market makers). Similarly here, for example, one affiant for the plaintiffs has stated:

> Since November, 1997, I have been Director, Pharmacy for Premier Purchasing Partners, L.P. ("Premier").... Premier is one of the largest group purchasing organizations.... A group purchasing organization ("GPO") is an alliance of hospitals or other institutional purchasers.... Based on my experience, I believe all GPOs operate in substantially the same way with regard to entering into contracts under which their members purchase pharmaceutical products.... Advocate and St. Charles are owners of Premier, Inc. and members of Premier. Thus, Premier serves as the agent of the Advocate hospitals and St. Charles, as well as approximately 3,200 other Premier members, when negotiating contracts pursuant to which Premier members purchase pharmaceutical products from Mylan (including Mylan's UDL subsidiary). *Each member executes a written agreement appointing Premier as its agent....* [A] Premier member pays the same contract price (exclusive of separate delivery costs) for the Mylan product regardless of whether the member takes delivery of the product directly from Mylan or through a wholesaler.... Premier was forced to agree, as agent for Premier's members, to Mylan's (and UDL's) lorazepam and clorazepate prices for the 1998–2000 contract period.... As stated above, *Premier acted solely as the agent in negotiating contract prices with Mylan, and Mylan's subsidiary UDL, on behalf of Premier members.*

Pls' Reply, Ex. F ¶¶ 2, 3, 11, 16, 18, 20 (Reiser Aff.) (emphasis added). The Court therefore finds that the plaintiffs have made a sufficient showing of standing.[10]

---

9. Market makers are securities middlemen whose profits stem primarily from the spread— that is, the difference between the bid price (to buy) and the ask price (to sell) for a given security, which is typically one-eighth point. *See NAS-DAQ,* 169 F.R.D. at 501–02.

10. The Court additionally notes that the proper allocation of damages to the proper plaintiffs can be made a later time, and if necessary, with the aid of subclasses. *See, e.g., Herbst v. International Tel. & Tel. Corp.,* 495 F.2d 1308, 1321 (2d Cir.1974) ("If it appears at some time in the

## 2. Rule 23(a) Prerequisites

Rule 23(a) permits certification only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. Proc. 23(a). Each of these requirements is addressed in turn below.

### a. Numerosity

■ The first prerequisite for certification is that the class be "so numerous that joinder of all members is impracticable." Fed. R.Civ.P. 23(a)(1). A precise number, however, is unnecessary as long as the plaintiffs provide a reasonable basis for their estimate. *See Kifafi v. Hilton Hotels Retirement Plan,* 189 F.R.D. 174, 176 (D.D.C.1999) ("So long as there is a reasonable basis for the estimate provided, the numerosity requirement can be satisfied without precise numbers."); *Pigford v. Glickman,* 182 F.R.D. 341, 347 (D.D.C.1998) ("Mere conjecture, without more, is insufficient to establish numerosity, but plaintiffs do not have to provide an exact number of putative class members in order to satisfy the numerosity requirement.").

■ As stated above, the plaintiffs' economics expert claims that there are at least 97 "invoice" customers and over 11,600 "contract" customers that purchased lorazepam and clorazepate from Mylan. Pls' Ex.1 ¶ 28 & n. 31. These numbers are sufficient for certifying a class under Rule 23(a). *See, e.g.,*

*Arnold v. Postmaster General,* 667 F.Supp. 6, 15 (D.D.C.1987) (finding class of 39 to a few hundred class member to be sufficient to sustain class action), *rev'd on other grounds,* 863 F.2d 994 (D.C.Cir.1988); *Committee of Blind Vendors v. District of Columbia,* 695 F.Supp. 1234, 1242 (D.D.C.1988) (finding class of 63 plaintiffs sufficient to sustain class action), *rev'd on other grounds,* 28 F.3d 130 (D.C.Cir.1994). And because the Mylan customers are geographically dispersed throughout the country, joinder is rendered more difficult making the class action device more appealing. *See Kifafi,* 189 F.R.D. at 176; *Pigford,* 182 F.R.D. at 347. With the exception of the defendant's standing objection, set forth and rejected above, the defendants offer no colorable rebuttal, and the Court therefore finds the numerosity requirement satisfied.

### b. Commonality

■ The second prerequisite is that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "The commonality test is met where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. County of El Paso,* 118 F.3d 421, 426 (5th Cir.1997), *quoted in Kifafi,* 189 F.R.D. at 176–77.

The plaintiffs have proffered several issues they believe to be common to the putative class, including definitions of the relevant markets for generic lorazepam tablets and generic clorazepate tablets for purposes of the conspiracy to monopolize and monopolization claims; whether the defendants con-

---

future that the proper allocation of damages would be effectuated by the designation of appropriate subclasses, it is undisputed that the court has all the power necessary to implement such a procedure. Fed.R.Civ.P. 23(c)(4). In any event, problems well down the road which may be pertinent to the procedures which ultimately should govern the allocation of damages need not and should not provide a roadblock to the prompt and conditional determination of whether this suit may be properly maintained as a class action.") (footnote omitted); *see Blackie v. Barrack,* 524 F.2d 891, 909 (9th Cir.1975) ("[C]ourts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue

at the very heart of the suit."); *Sol S. Turnoff Drug Distributors, Inc. v. N.V. Nederlandsche Combinatie Voor Chemische Industrie,* 51 F.R.D. 227 (E.D.Pa.1970) ("[A]t least at this stage of the case, all the members of the class ... have a common interest in a favorable verdict on the issue of a conspiracy.... [T]he possibility ... that it may develop that the interests with respect to damages of several groups within the class ... will conflict, cannot at this point justify the denial of a class action.") *quoted in NASDAQ,* 169 F.R.D. at 514 (additionally noting that "if real antagonism later develops among the interests of various class members, the problem could be addressed through the creation of subclasses under Rule 23(c)(4)").

spired to monopolize sales of lorazepam and clorazepate; whether defendants monopolized sales of lorazepam and clorazepate; whether the defendants conspired to fix prices of lorazepam; the duration of the defendants' conspiracies to monopolize and fix prices; the duration of the defendants' monopolization; the success and impact of the defendants' conspiracies to monopolize and fix prices conspiracies, the success and impact of the defendants' monopolization; and the legality of the defendants' actions. *See* Pls' Mem. at 15 (listing the purported common issues). Such issues have been found to satisfy the commonality requirement in other antitrust cases. *See, e.g., In re Ampicillin Antitrust Litigation,* 55 F.R.D. 269, 273 (D.D.C.1972) (finding commonality where "[e]ach of the class actions allege[d] that the defendants' violations of Sections 1 and 2 of the Sherman Act ha[d] caused the price of ampicillin and other semisynthetic penicillins to be maintained at high, arbitrary and non-competitive levels throughout the United States, all to the injury of plaintiffs and the particular class members"); *NASDAQ,* 169 F.R.D. at 510 (stating that "[n]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)" and citing cases). Without any objection from the defendants concerning commonality, the Court has little difficulty finding these issues to be common among the putative class members.

#### c. *Typicality*

█ The third prerequisite for class certification requires a finding that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). As stated by this Court, this requirement is " 'intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class members so as to assure that the absentees' interests will be fairly represented.'" *Kifafi,* 189 F.R.D. at 177 (quoting *Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 57 (3d Cir.1994)); *accord*

*Pigford,* 182 F.R.D. at 349. Typicality is met "if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability." *Pigford,* 182 F.R.D. at 349.

The defendants rely on their standing arguments to contend that the plaintiffs have made an insufficient showing of typicality. However, the Court agrees with the plaintiffs that their theories of monopolization, conspiracy to monopolize, and price fixing will be the same for all proposed class members. The claims all stem from the defendants' unlawful price-fixing and monopolization of the supply of APIs and its consequences in the lorazepam and clorazepate markets. Thus, as one court stated:

> There has been general agreement that the existence of varying fact patterns to support the claims of individual class members does not mandate a finding of a lack of typicality, as long as the claims arise out of the same legal or remedial theory.... As noted above, there is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members. The diversity of named plaintiffs who differ in their methods of operation and conduct is often cited by defendants as an impediment to class certification. However, as long as the substance of the claim is the same as it would be for other class members, then the claims of named plaintiffs are not atypical.

*In re Catfish Antitrust Litigation,* 826 F.Supp. 1019, 1036 (N.D.Miss.1993); *accord, e.g., In re Flat Glass Antitrust Litigation,* 191 F.R.D. 472, 480 (W.D.Pa.1999). In *Flat Glass,* purchasers of flat glass products brought a horizontal price-fixing conspiracy action against the manufacturers. The defendants argued that the plaintiffs could not prove typicality because the flat glass product markets in which each plaintiff participated and the products the plaintiffs bought, fabricated, installed, or sold showed that the plaintiffs could not present evidence uniformly applicable to all putative class members. *See* 191 F.R.D. at 479. The court rejected the argument, stating:

Indeed, the named class members' claims, as well as the claims of the proposed classes, arise from the alleged price-fixing scheme perpetrated by defendants. The overarching scheme is the linchpin of plaintiffs' amended complaint, regardless of the product purchased, the market involved or the price ultimately paid. Furthermore, the various products purchased and the different amount of damage sustained by individual plaintiffs do not negate a finding of typicality, provided the cause of those injuries arises from a common wrong.

*Id.* at 480. Having already rejected the defendants' standing objections, and finding that the same theories of liability will be advanced by both the class representatives and the putative class members, the Court concludes that the plaintiffs' have met their burden for typicality. "Although [the plaintiffs] may not have suffered identical damages, that is of little consequence to the typicality determination when the common issue of liability is shared." *Lewis,* 146 F.R.D. at 9. *Cf., e.g., In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 88 (S.D.N.Y.1998) ("[F]actual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class.") (citing *Green v. Wolf,* 406 F.2d 291, 299–301 (2d Cir.1968)).

#### d. Adequacy

■ The final prerequisite for class certification is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This prerequisite requires that the Court examine such factors as the quality of class counsel, the existence of any adverse interests between class representatives and other class members, communication between class counsel and the class, and the overall context of the litigation. *See Kifafi,* 189 F.R.D. at 177 (citing *Twelve John Does v. District of Columbia,* 117 F.3d 571, 575 (D.C.Cir.1997)); *Pigford,* 182 F.R.D. at 350 (citing *Twelve John Does,* 117 F.3d at 575).

There has been no dispute about the quality of class counsel in this case; it is uncontested that the plaintiffs' counsel are experienced antitrust lawyers who have collectively litigated numerous successful antitrust and class action cases. *See* Pls' Ex. 4 (collecting counsel resumes). Respecting adverse interests and the overall context of the litigation, however, the defendants once again rely on their standing arguments to call into question the adequacy of the class representatives. But it is clear to the Court that the plaintiffs have vigorously pursued this lawsuit to date and have a significant financial stake in achieving a successful outcome. And again, having rejected the defendants standing arguments, the Court can find no substantiated adversity of interest between the named plaintiffs and other class members. As noted above, all putative class members share the same remedial theory, and any potential conflicts over damages can be addressed appropriately at a later point. *See Herbst,* 495 F.2d at 1321; *Blackie v. Barrack,* 524 F.2d at 909; *Sol S. Turnoff,* 51 F.R.D. at 227; *NASDAQ,* 169 F.R.D. at 514. Thus, the Court concludes that the plaintiffs have made a sufficient showing of adequacy at this stage.

#### 3. Rule 23(b) Requirement

■ In addition to satisfying all four prerequisites under Rule 23(a), the plaintiffs must also demonstrate that the action is maintainable under one of the three requirements of Rule 23(b). Fed.R.Civ.P. 23(b). The plaintiffs contend that the proposed class satisfies the requirements of Rule 23(b)(3), under which the plaintiffs must show predominance and superiority. That is, Rule 23(b)(3) requires "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) further provides that matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the

controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

The common issues must only predominate; they do not have to be dispositive of the litigation. *Potash*, 159 F.R.D. at 693. There are no bright line tests for determining whether common questions predominate, but in general a claim will suffice "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *Id.; accord In re Workers' Compensation*, 130 F.R.D. 99, 108 (D.Minn.1990). Antitrust actions involving common question of liability for monopolization and price-fixing have frequently been held to predominate for the preliminary stage of class certification. *See id.; Ampicillin*, 55 F.R.D. at 276; *Stephenson*, 177 F.R.D. at 288–89. In this case, to ultimately prevail on their price-fixing claims, the plaintiffs must demonstrate (1) a violation of the antitrust law; (2) direct injury (or impact) from the violation, and (3) damages. *See, e.g., Potash*, 159 F.R.D. at 693 (citing *Workers' Compensation*, 130 F.R.D. at 108; *Wirebound Boxes*, 128 F.R.D. at 271).[11]

The defendants again rely on their standing arguments, claiming that the individualized analysis required to determine a proper class of "direct" purchasers "eclipses whatever common issues there might be." Defs' Mem. at 32. *Cf., e.g., Keating v. Philip Morris, Inc.*, 417 N.W.2d 132, 137 (Minn.Ct. App.1987) (denying class certification when "determination of fact or amount of individual damage [would] require thousands of factual examinations done on a retailer by retailer basis, and a transaction by transaction basis"). For largely the same reasons it has already rejected the defendants' arguments, as explained at greater length above, the

Court is convinced that common issues predominate; proof of each of the requisite elements in this action will be common among all class members and predominate over any individual issues, such as damages.

As is true in many antitrust cases, the alleged violations of the antitrust laws at issue here respecting price fixing and monopolization relate "solely to Defendants' conduct, and as such proof for these issues will not vary among class members." *Potash*, 159 F.R.D. at 694; *see also, e.g., Lumco Indus.*, 171 F.R.D. at 172 ("The fact-finder's focus of inquiry will be on the ... Defendants' words and actions; it will not vary among individual class members. Several courts have held that when a defendant is alleged to have participated in a nationwide price-fixing conspiracy, impact will presumed as a matter of law, and the predominance requirement of Fed.R.Civ.P. 23(b)(3) will be satisfied."); *Ampicillin*, 55 F.R.D. at 278 (finding that "the existence of a conspiratorial agreement among the defendants to lessen competition in and exclude competitors from the manufacture and sale of ampicillin and other semisynthetic penicillins, and to secure power over the price of these drugs, as well as the activities which carried out the alleged agreement and resulted in damage to the plaintiffs, are common items of proof which predominate over issues of damages peculiar to each claimant").

In addition, issues concerning antitrust impact, or the fact of injury, are also common to the class and predominate. The plaintiffs intend to prove that through the defendants' monopolization, they were able to hike and sustain prices of lorazepam and clorazepate at artificially high levels causing antitrust injury. Needless to say, the plaintiffs do not have to actually prove the injury at this stage; rather, they must demonstrate that their attempt to evidence impact will involve common issues that predominate. *See, e.g., Lumco*, 171 F.R.D. at 174. The plaintiffs' economics expert, Professor Frank, has detailed the approach the plaintiffs intend to take with respect to analyzing impact and

---

**11.** To prevail on their monopolization claims, the plaintiffs must similarly establish (1) possession of monopoly power in the relevant market, (2) willful acquisition or maintenance of that power, and (3) antitrust injury. *See, e.g., Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir.1992).

has concluded "that class-wide and market-wide analysis is required and is the most efficient way of assessing liability and measuring impact and damages," Pls' Mem., Ex. 1 ¶ 9 (Frank Aff.); *see also id.* ¶¶ 8–21. For example, the plaintiffs intend to analyze the impact through evidence concerning entry conditions for market actors and through an analysis of Mylan's sales transaction data, which is class- and market-wide. Beyond their standing arguments, the defendants offer no further convincing rejoinder to the predominance of such common issues of proof. The Court is convinced at this stage, therefore, that generalized evidence exists for attempting to prove antitrust impact and that the analyses involved will be conducted most efficiently on a class-wide basis and involve common issues of proof that predominate. As one court stated in finding common impact in an alleged price-fixing case, despite individual negotiations, varied purchase methods, and different amount and types of the product purchased:

> As long as the existence of a conspiracy is the overriding question, then the class has met its predominance requirement.... To prove injury, plaintiffs need only demonstrate they have suffered some damage from the unlawful conspiracy.... Such a showing may be made on a class basis if the evidence demonstrates that the conspiracy succeeded in increasing prices above the competitive level.

*Workers' Compensation,* 130 F.R.D. at 109 (citations omitted); *see also, e.g., In re Plywood Anti Trust Litig.,* 76 F.R.D. 570, 584 (E.D.La.1976) ("[I]f the members of each of the classes prove they purchased softwood plywood during the relevant period and that defendants conspiratorially increased or stabilized plywood prices, then the trier of fact may conclude that the requisite fact of injury occurred. Therefore, the fact of injury issues do not give rise to a host of individual questions which destroys the requisite predominance of questions common to the classes."); *Plastic Cutlery,* 1998 WL 135703, at *2 ("Class actions are widely-recognized as being particularly appropriate for the litigation of antitrust cases alleging a price-fixing conspiracy because price-fixing schemes presumably impact all purchasers in the affected market, so that common questions on the issue of liability predominate."). Moreover, the fact that there may be individual differences in prices paid by individual class members does not change this conclusion. *See, e.g., Flat Glass,* 191 F.R.D. at 486 ("More importantly, the proof plaintiffs must adduce to establish a conspiracy to fix prices, and that defendants base price was higher than it would have been absent the conspiracy, would be common to all class members. Therefore, even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied.").

The Court is equally convinced that common damages issues will predominate. "Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *Potash,* 159 F.R.D. at 697 (citing *In re Industrial Gas Antitrust Litig.,* 100 F.R.D. 280, 306 (N.D.Ill.1983)). The plaintiffs' expert here has provided several reasonable approaches to calculating damages. *See* Pls' Mem., Ex. 1 ¶¶ 30–33 (Frank Aff.). For example, the plaintiffs propose that damages can be calculated in the aggregate for the class as a whole, with allocation to particular class member to be accomplished after trial through an administrative claims procedure. *See, e.g., In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 333 F.Supp. 278, 281 (S.D.N.Y. 1971). The plaintiffs alternatively propose that a damages formula may be utilized that would be applied to the purchases of each class member as shown in Mylan data. *See, e.g., Brown,* 146 F.R.D. at 4; *Lumco,* 171 F.R.D. at 174. The Court finds at this juncture that the plaintiffs' experts suggested methods "are not so insubstantial and illusive as to amount to no method at all," and therefore that the plaintiffs have met their burden. *Commercial Tissue,* 183 F.R.D. at 596.

■ Finally, the Court is convinced at this time that a class action approach to this

litigation is superior to any possible alternatives. Without a class action approach, a significant number of individual lawsuits could be filed. Such a result not only raises the possibility of unnecessarily wasting judicial resources, but also raises the specter of inconsistent adjudications. Class certification thus provides the opportunity for an efficient resolution of a multitude of common issues for the entire class in a single forum. *See, e.g., Brown,* 146 F.R.D. at 5; *Lewis v. National Football League,* 146 F.R.D. 5, 12 (D.D.C.1992). A class action would also provide inclusion of those members who would otherwise be unable to afford independent representation. *See, e.g., NASDAQ,* 169 F.R.D. at 527 ("Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims...."). The Court therefore finds a class action approach superior in this case.

### III. CONCLUSION

For the foregoing reasons, the Court will deny the defendants' motion to dismiss, grant the plaintiffs' motion for class certification, and in accordance with Federal Rule of Civil Procedure 23(c)(2) will direct that the parties jointly submit a proposed class notice.